O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LARRY DARNELL TAYLOR,           )   Case No. CV 11-8253-OP
                                )
              Petitioner,       )
                                )
         v.                     )   MEMORANDUM OPINION AND
                                )   ORDER
TIM BUSBY, Warden,              )
                                )
              Respondent.       )
                                )

**I.**

**PROCEEDINGS**

On October 4, 2011, Larry Darnell Taylor ("Petitioner") filed a Petition for

Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254

("Petition"). On March 22, 2012, Respondent filed an Answer to the Petition.

(ECF No. 18.) On April 11, 2012, Petitioner filed a Traverse to the Answer. (ECF

No. 22.) Thus, this matter is ready for decision.[1]

_____

[1] Pursuant to 28 U.S.C. § 636(c) and C.D. Cal. R. 73-3, the parties
consented to proceed before the United States Magistrate Judge in the current
action. (ECF Nos. 3, 16.)

1

## II.

## PROCEDURAL HISTORY

On July 16, 2009, Petitioner was convicted after a jury trial in the Los Angeles County Superior Court of the sale, transportation, or offer to sell cocaine base (Cal. Health & Safety Code § 11352(a)).  (Clerk's Transcript ("CT") at 227.) In a separate proceeding, the trial court found true the special allegations that Petitioner had suffered fifteen prior strike convictions (Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d)), one prior drug conviction (Cal. Health & Safety Code § 11370.2(a)), and had served a prison term within five years of the charged offense (Cal. Penal Code § 667.5(b)).  (CT at 227.)  On August 14, 2009, Petitioner was sentenced to a total state prison term of fourteen years.[2]  (Id. at 334-37.)

Petitioner appealed the conviction to the California Court of Appeal.[3] (Lodgments 9-15.)  On June 8, 2011, the court of appeal affirmed the judgment. (Lodgment 17.)

On June 29, 2011, Petitioner filed a petition for review in the California Supreme Court.  (Lodgment 18.)  On August 17, 2011, the supreme court denied review.  (Lodgment 19.)

## III.

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Since Petitioner is challenging the sufficiency of the evidence, the Court has independently reviewed the state court record.  See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).  Based on this review, the Court adopts the factual

---

[2]  Petitioner was tried with co-defendant Lindsey Richards.  Richards' conviction was reversed on appeal due to instructional error.  (Lodgment 17 at 6-8, 14.)

[3]  Petitioner filed six supplemental briefs in the court of appeal.  (Lodgment 17 at 9.)

discussion of the California Court of Appeal opinion, as a fair and accurate summary of the evidence presented at trial:[4]

Pomona Police Department Officers Reginald Villanueva and Vanessa Munoz were working undercover as part of a narcotics task force on the afternoon of June 27, 2008. . . . They were in an unmarked car in an area of Pomona where narcotics sales and activity had been reported. There were several people on the sidewalk, and Villanueva stopped his car at the curb. Richards, whom Villanueva had never seen before, approached the car window. Villanueva asked for "Ken Dog" or "Bo," but Richards said they were not there. Richards said he would make a phone call to get what Villanueva needed and asked Villanueva to return in two to five minutes. As Villanueva drove away, he saw Richards ride a bicycle to a pay phone. After about five minutes, Villanueva returned to the same location, but left when he did not see Richards.

Villanueva testified that when he returned the second time, he saw Richards and Taylor. Villanueva knew Taylor from a prior undercover operation in which Taylor and Ken Dog rode around with Villanueva attempting to find someone selling cocaine. The prior contact ended when their car was "pulled over by the team." Before parking at the curb, Villanueva turned on a video camera that was located in the cup

---

[4] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2254(e)(1)). Recent Ninth Circuit cases have accorded the factual summary set forth in an opinion of the California Court of Appeal a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). See, e.g., Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (citations omitted); Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

holder.   The camera was pointed toward the front passenger-side window.   Richards raised his hand with the palm forward and fingers extended, which Villanueva believed was a signal to wait.   Richards and Taylor, who were "four to five paces" apart, walked up to one another. Villanueva thought Richards handed something to Taylor.   Taylor then walked to the passenger side of the officers' car.   Munoz, who was seated in the front passenger seat, handed Taylor a $20 bill and Taylor handed her an off-white rock that appeared to be rock cocaine.   Richards then walked up to the car, leaned in through the front passenger window and asked if everything was all right.   Richards shook Villanueva's hand and, as he did so, handed him a second off-white rock.   Villanueva admitted that he had testified at the preliminary hearing that Richards handed the rock to Munoz, but said that reviewing the video before trial refreshed his recollection.   Richards and Taylor walked away.   They were not arrested that day.   Chemical analysis subsequently established that both of the rocks contained cocaine base.

The video recorded by the camera concealed inside the undercover car was played at trial.   We have watched the video, which includes sound.   The video does not show the initial contact with Richards.   It also does not show Richards signaling Villanueva to stop when the officers returned to the location or Richards handing anything to Taylor.   The first event seen on the video is Taylor at the car window. After Villanueva and Munoz greeted Taylor, Taylor asked, "You want a dub?" which Villanueva testified meant $20 worth of cocaine.   Both officers said, "Yeah."   Taylor then pointed at Villanueva as he said, "Tony," as if recognizing him.   Villanueva replied, "Yeah."   Taylor asked, "Where's your car at?"   Villanueva said, "This is my girl's car." Taylor then asked, "[D]id they follow you or anything?"   Villanueva

4

said, "No."  Taylor said, "They let me go," then recounted police checking his records and releasing him because he had been discharged from parole. He added, "I'm clean–no warrants, no probation, no parole. And I want to stay that way.  You know."  Villanueva said that was "cool," then asked, "Is he going to hook me up or what?"  Taylor replied, "I got it. Right here."  Villanueva asked, "Oh, he gave it to you?"  Taylor said, "Yeah," followed by something indecipherable. Munoz handed money to Taylor and Taylor placed the rock in Munoz's outstretched palm. Taylor asked for "a hit."  Villanueva refused, saying they were "about to take off."  Taylor said, "You can break me a hit." Villanueva told Taylor to "[b]reak it."  Taylor said, "He ain't going to give me shit."  Munoz and Villanueva repeatedly urged Taylor to break off a piece.  Taylor took the rock from Munoz's palm, which was still outstretched, pinched off a piece, and handed the rest back to Munoz. He then asked if the piece he had broken was too big.  Munoz looked at it and said, "No, you're cool."  Taylor said, "Cause, yeah, they have to get, you know, they have to get to know you.  You know, I sort of got to know you, you know."  He continued, "But I know you now, I'll see you in the future, you know."  Taylor asked if they were coming back later, and Villanueva said he would.  A second or so later, Richards leaned in the car window and asked, "You alright?"  Villanueva said, "Yeah," and asked Richards's name.  Richards replied, "Z," and Villanueva said, "Z. Tony."  During the introductions, Richards first bumped fists with Villanueva, then shook Villanueva's hand. Villanueva said, "Ah, for real. Alright, Z."  Munoz said, "Thank you, man."  Although it is possible that Richards transferred something to Villanueva during the handshake, no transfer is visible on the video, and Villanueva does not display any item received from Richards on the

5

video.

Richards testified that as of June 27, he had been homeless and living on the streets or in a "tent city" in Pomona or Ontario and for about nine years.   He was a long-time cocaine abuser and had occasionally helped street-level drug dealers sell drugs in exchange for a little money or cocaine for his own consumption.  Sometimes he would sell a friend a small piece of the cocaine he was going to use.   On cross-examination he estimated he had sold drugs between five and 10 times.

Richards testified that on June 27 Villanueva pulled to the curb near him and asked if he knew Ken Dog or Bo.  Richards knew of a man called Bo who sold drugs.  Richards said that if he saw Bo, he would send him toward Villanueva.  Richards denied telling Villanueva that he would make a phone call to get what Villanueva needed and explained that he would have no way of knowing which of the several different types of drugs sold in the area Villanueva wanted.  Richards rode off on his bicycle to buy a sandwich.  About 45 minutes or an hour later, Richards was riding back through the area where he had met Villanueva. It was a grassy, shaded area where homeless people often gathered. Richards saw Taylor, whom he knew from the streets, and two other men sitting there.  Richards stopped to talk to them.  As the officers' car approached, Richards told the men that he thought "these people are looking for somebody.  They were looking for Bo and some guy named Ken Dog. . . . [T]hey might be looking for something."

Richards testified that when the officers' car stopped at the curb, he made the hand gesture Villanueva described to signal them to wait. He then told Taylor and the other two men, "I think these people are looking for something, . . . but, personally, I don't trust them."  Taylor

6

walked up to the officers' car.  Richards did not know what Taylor was going to do, did not know whether Taylor had drugs to sell, and did not hand anything to Taylor.  Richards could neither hear the conversation between Taylor and the officers nor see what happened in the car, but he "was almost positive something took place there," and he thought the officers might give him two or three dollars if they thought he had facilitated the transaction, so he went up to the car.  Villanueva asked Richards his name.  Richards responded, "Z," then shook Villanueva's hand because a handshake customarily follows an introduction. Richards denied handing anything to either officer.  Richards explained that he had been a drug addict for more than 25 years and would "rather have drugs than . . . food."  Under no circumstances would he give away drugs, though he sometimes allowed people, including Taylor, to have a "hit off of" his pipe.

Richards admitted he had been convicted of selling drugs in 2004 based on two $20 sales of drugs to the same undercover police officer over a two-day period.

Taylor represented himself through most of the pretrial proceedings and at trial.  He presented no defense.

(Lodgment 17 at 2-6.)

## IV.

## PETITIONER'S CLAIMS

Petitioner raises the following claims for habeas corpus relief:

(1)   The trial court deprived Petitioner of due process and right to a fair trial when it refused to allow him to present a defense of entrapment ("Claim One") (Pet. Attach. at 7-10);

(2)   The trial court deprived Petitioner of due process and his right to a fair trial by departing from an agreed-upon jury instruction regarding

1   entrapment ("Claim Two") (id. at 11-14);

2   (3)   The trial court denied Petitioner his right to confront and cross-

3         examine two police officers, whose testimony was relevant to

4         Petitioner's innocence ("Claim Three") (id. at 15-17a);[5]

5   (4)   The criminalist and prosecutor destroyed evidence by using all of the

6         alleged rock in the testing process, and failed to submit a chemical

7         analysis/toxicology report at the preliminary hearing, violating

8         Petitioner's right to due process and a fair trial ("Claim Four") (id. at

9         17b-19); and

10  (5)   The prosecutor failed to prove that the drug contained cocaine base,

11        and, therefore, the evidence is insufficient to support the guilty

12        verdict ("Claim Five") (id. at 20-25).

**V.**

**STANDARD OF REVIEW**

The standard of review applicable to Petitioner's claims is set forth in 28

U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"):

(d)   An application for a writ of habeas corpus on behalf of a person

      in custody pursuant to the judgment of a State court shall not be

      granted with respect to any claim that was adjudicated on the

      merits in State court proceedings unless the adjudication of the

      claim--

      (1)   resulted in a decision that was contrary to, or

            involved an unreasonable application of, clearly

            established Federal law, as determined by the

---

[5]  There are two pages numbered 17.  Therefore, the Court will refer to the
first as 17a and the second as 17b.

1    Supreme Court of the United States; or

2    (2)    resulted in a decision that was based on an

3           unreasonable determination of the facts in light of

4           the evidence presented in the State court proceeding.

5    28 U.S.C. § 2254(d).  If these standards are difficult to meet, it is because they

6    were meant to be.  Harrington v. Richter, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624

7    (2011).  AEDPA "stops short of imposing a complete bar on federal court

8    relitigation of claims already rejected in state proceedings[,]" and a writ may issue

9    only "where there is no possibility fairminded jurists could disagree that the state

10   court's decision conflicts" with United States Supreme Court precedent.  Id.

11   Further, a state court factual determination shall be presumed correct unless

12   rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

13   Under the AEDPA, the "clearly established Federal law" that controls

14   federal habeas review of state court decisions consists of  holdings (as opposed to

15   dicta) of Supreme Court decisions "as of the time of the relevant state-court

16   decision."  Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d

17   389 (2000).  To determine what, if any, "clearly established" United States

18   Supreme Court law exists, the court may examine decisions other than those of the

19   United States Supreme Court.  LaJoie v. Thompson, 217 F.3d 663, 669 n.6 (9th

20   Cir. 2000).  Ninth Circuit cases "may be persuasive."  Duhaime v. Ducharme, 200

21   F.3d 597, 600 (9th Cir. 1999).  On the other hand, a state court's decision cannot

22   be contrary to, or an unreasonable application of, clearly established federal law, if

23   no Supreme Court precedent creates clearly established federal law relating to the

24   legal issue the habeas petitioner raised in state court.  Brewer v. Hall, 378 F.3d

25   952, 955 (9th Cir. 2004); see also Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct.

26   649, 166 L. Ed. 2d 482 (2006) (in the absence of a Supreme Court holding

27   regarding the prejudicial effect of spectators' courtroom conduct, the state court's

28   decision could not have been contrary to or an unreasonable application of clearly

established federal law).

Although a particular state court decision may be both "contrary to" and an "unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings.  Williams, 529 U.S. at 405.  A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts.  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam) (citing Williams, 529 U.S. at 405-06).  When a state court decision adjudicating a claim is "contrary to" controlling Supreme Court precedent, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)."  Williams, 529 U.S. at 406.  However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Packer, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts.'"  Id. at 11 (citing 28 U.S.C. § 2254(d)).  Consequently, a state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case.  See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam).  However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable."  Visciotti, 537 U.S. at 27.  An "unreasonable application" is different from an erroneous or incorrect one.  Williams, 529 U.S. at 409-10; see also Visciotti, 537 U.S. at 25.

1    Where, as here, the California Supreme Court denies a petitioner's claims

2  without comment, the state high court's "silent" denial is considered to be "on the

3  merits" and to rest on the last reasoned decision on these claims, in this case, the

4  grounds articulated by the California Court of Appeal in its decision.  See Ylst v.

5  Nunnemaker, 501 U.S. 797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991);

6  Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1992); see also Kennedy v.

7  Lockyer, 379 F.3d 1041, 1052 (9th Cir. 2004); Gill v. Ayers, 342 F.3d 911, 917

8  n.5 (9th Cir. 2003).

9                                    **VI.**

10                              **DISCUSSION**

11  **A.    Habeas Relief Is Not Warranted on Petitioner's Claim That the Trial**

12       **Court Violated His Constitutional Rights When It Prevented Him from**

13       **Presenting an Entrapment Defense.**

14       **1.    Background.**

15       At the trial readiness hearing and after the prosecutor showed the police

16  video in court, Petitioner told the judge he wanted to present an affirmative

17  defense of entrapment.  (Pet. Attach. at 8.)  The trial judge told Petitioner "[t]hat's

18  fine," and "[w]e'll see you on Friday."  (Id. (quoting Reporter's Transcript ("RT")

19  at E3, E10-E12).)  Petitioner contends that this constituted approval for Petitioner

20  to proceed to trial using that defense.  (Id.)  During jury selection, Petitioner

21  questioned the jury on entrapment.  (1st Aug. RT at 56-61.)  The judge read the

22  instruction on entrapment to the jury at that time.  (Id.)

23       In Claim One, Petitioner claims that although prior to trial the court found

24  there was evidence of entrapment, during trial he was prevented from preparing

25  and presenting an entrapment defense, thereby violating his rights to a fair trial

26  and due process.  (Pet. Attach. at 7-10.)  In Claim Two, he contends that his rights

27  to due process and a fair trial were violated because the trial court refused to re-

28  instruct the jury on entrapment and precluded him from arguing the defense to the

1    jury. (Id. at 11-14.)

2           **2.    California Court Opinions:**

3    The California Court of Appeal rejected this claim:

4    [Taylor] argues that the evidence established entrapment based upon the

5    conduct of Villanueva and Munoz, and the trial court erred by refusing

6    to instruct the jury on entrapment and refusing to let him argue

7    entrapment, even though it had "found that there was evidence of

8    entrapment" before trial began and "certified the issue of entrapment to

9    the jury" by reading a jury instruction during voir dire that defined

10   entrapment.  The trial court did not find that there was evidence of

11   entrapment, before or after the presentation of evidence.  It defined

12   entrapment for the jury during voir dire because Taylor was asking

13   questions of potential jurors about their attitude toward an entrapment

14   defense.   The court was not required to include an entrapment

15   instruction in the charge to sitting jurors unless there was substantial

16   evidence of entrapment.   There was no evidence of entrapment

17   presented at trial. Taylor approached the officers' car and asked if they

18   wanted to buy "a dub" as soon as they said hello to him. The officers

19   did not entice or pressure Taylor into doing anything.  Neither the

20   officers' acceptance of Taylor's offer to sell them "a dub" nor

21   Villanueva's subsequent question about whether the transaction was

22   going to be completed constituted conduct "likely to induce a *normally*

23   *law-abiding person* to commit the offense." In his second supplemental

24   brief, Taylor argues that "he was 'enticed' into participating in the

25   transaction by repeated [sic] and insistant [sic] requests and offering of

26   extraordinary benefit, (cocaine), and payment in drugs." The record

27   belies this contention. After the drug sale was completed, Taylor asked

28   the officers if he could "have a hit."   Villanueva refused.   Taylor

1 | insisted, "You can break me a hit."  Villanueva responded, "Break it
2 | then," and Munoz joined, saying, "Go ahead and break it, man."  The
3 | officers' acquiescence to Taylor's repeated requests for part of the rock
4 | he had just sold them does not constitute entrapment.  Taylor also argues
5 | that he was entrapped because the police did not seize the buy money
6 | from him, the police let him go after detaining him, and Munoz and
7 | Villanueva did not "dispose of the contraband in the manner prescribed
8 | by law," and they thus "committed 'outrageous conduct.'"  None of
9 | these acts would show entrapment, and there was no evidence at trial on
10 | any of these points other than testimony by Villanueva that neither
11 | Richards nor Taylor was arrested on June 27.  Because there was no
12 | evidence of entrapment, the trial court did not err by prohibiting Taylor
13 | from arguing the theory to the jury.

14 | (Lodgment 17 at 9-10 (citations omitted).)

15 | **3.    State Law Error.**

16 | Respondent contends that Claim One and the failure to instruct aspect of

17 | Claim Two fail to allege federal questions.  (Answer at 7-10.)  This Court agrees.

18 | On habeas corpus review, a federal court is limited to deciding whether a

19 | conviction violated the Constitution, laws, or treaties of the United States.  Estelle

20 | v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (noting

21 | that "it is not the province of a federal habeas court to reexamine state-court

22 | determinations on state-law questions.").  To the extent Petitioner claims that the

23 | trial court violated his rights under state law, the claim is not cognizable on federal

24 | habeas review.  Id.  Thus, this Court limits its consideration to the alleged federal

25 | constitutional violations.

26 | Moreover, the entrapment defense "is not of a constitutional dimension."

27 | United States v. Russell, 411 U.S. 423, 430-33, 93 S. Ct. 1637, 36 L. Ed. 2d 366

28 | (1973).  It is a court-created limitation on governmental activity.  United States v.

1   Emmert, 829 F.2d 805, 808 n.1 (9th Cir. 1987).  Accordingly, an alleged

2   misapplication of law relating to entrapment does not raise a cognizable federal

3   constitutional claim.  Noble v. Harrison, 491 F. Supp. 2d 950, 961 n.7 (C.D.

4   Cal.2007) (citing Benson v. Carter, 396 F.2d 319, 322 (9th Cir. 1968)).  As such,

5   Claim One is not cognizable on federal habeas review.

6   　　　With respect to the failure to instruct aspect of Claim Two, claims of error

7   in state jury instructions are generally a matter of state law and do not usually

8   invoke a constitutional question.  Gilmore v. Taylor, 508 U.S. 333, 342-343, 113

9   S. Ct. 2112, 124 L. Ed. 2d 306 (1993).  "Claims that merely challenge the

10  correctness of jury instructions under state law cannot reasonably be construed to

11  allege a deprivation of federal rights."  Van Pilon v. Reed, 799 F.2d 1332, 1342

12  (9th Cir. 1986); see also Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir.

13  2005) ("Any error in the state court's determination of whether state law allowed

14  for an instruction . . . cannot form the basis for federal habeas relief."); Dunckhurst

15  v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone

16  raise a ground cognizable in a federal habeas corpus proceeding.").  Thus, to the

17  extent Petitioner contends that the failure to give the jury instruction on

18  entrapment violated state law, such a claim is not cognizable on federal habeas

19  review.

20  　　　**4.    *Teague* Bars Petitioner's Claims.**

21  　　　Respondent contends that the instructional aspect of Claim Two is barred by

22  Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).[6]

23  

24  ───────────────

25  　　　[6]  The Ninth Circuit has held that, in order to assert a Teague claim, at a
    minimum:  (1) Teague should be identified as an issue, indeed the first issue; (2)

26  the new rule of constitutional law that falls within its proscription should be
    articulated; (3) the reasons why such a rule would not have been compelled by

27  existing precedent should be explained with particular reference to the appropriate

28  　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(continued...)

14

1  (Answer at 10-14.)

2       In <u>Teague</u>, the Supreme Court held that a new rule of constitutional law

3  cannot be applied retroactively on federal collateral review to upset a state

4  conviction or sentence unless the new rule forbids criminal punishment of

5  primary, individual conduct or is a "watershed" rule of criminal procedure.

6  <u>Caspari v. Bohlen</u>, 510 U.S. 383, 396, 114 S. Ct. 948, 127 L. Ed. 2d 236 (1994).

7  The Supreme Court has made it clear that federal habeas courts must decide at the

8  outset whether <u>Teague</u> is implicated if the state argues that the petitioner seeks the

9  benefit of a new rule.  <u>Id.</u> at 389.  This is true regardless of whether the case is

10  governed by AEDPA.  <u>Horn v. Banks</u>, 536 U.S. 266, 272, 122 S. Ct. 2147, 153 L.

11  Ed. 2d 301 (2002).

12       Respondent claims that <u>Teague</u> bars relief because there was no existing

13  precedent at the time Petitioner's conviction became final, that the right to present

14  a defense in a criminal trial includes the right to have a jury instructed on

15  affirmative defenses.  (Answer at 11-12.)  The Court agrees.

16       Respondent cites to the case of <u>Gilmore v. Taylor</u>, 508 U.S. 333, 343-44,

17  113 S. Ct. 2112, 124 L. Ed. 2d 306 (1993), for the proposition that the right to

18  present a defense applies to evidence and witnesses, but not to instructions.

19  (Answer at 11-12.)  In <u>Gilmore</u>, the Supreme Court found that <u>Teague</u> precluded

20  relief in a case where the prisoner argued that the right to present a defense

21  included the right to have the jury consider it, and that confusing jury instructions

22  which prevented a jury from considering an affirmative defense, violate due

23  process.  <u>Gilmore</u>, 508 U.S. at 343-44; <u>see also</u> <u>Turner v. Marshall</u>, 63 F.3d 807,

24  819 (9th Cir. 1995), <u>overruled on other grounds by</u> <u>Tolbert v. Page</u>, 182 F.3d 677

25  _____

26       [6](...continued)

27  universe of precedent; and (4) an argument should be made why the rule
contended for is not within one of <u>Teague</u>'s exceptions.  <u>Arredondo v. Ortiz</u>, 365

28  F.3d 778, 781-82 (9th Cir. 2004).

1   (9th Cir. 1999), (noting that "[w]ith the intercircuit split on whether the lack of a

2   lesser included offense instruction in a noncapital case presents constitutional

3   error, any finding of constitutional error would create a new rule, inapplicable to

4   the present case under Teague."); Tirado v. Warden, 576 F. Supp. 2d 1104, 1110

5   (C.D. Cal. 2008) (Teague barred relief as to habeas petitioner's claim of jury

6   instructional error regarding affirmative defense of good faith belief in consent in

7   prosecution for forcible sexual offense).

8        Based on the foregoing authority, the Court agrees with Respondent that

9   Teague is applicable to Petitioner's claims and that no exceptions apply. (Answer

10  at 13-14.) Thus, habeas relief is unavailable on the instructional aspect of Claim

11  Two because it would require the Court to apply a new rule of law in a habeas

12  case. Turner, 63 F.3d at 818-19.

13       **5.    Analysis.**

14       Even assuming that Petitioner's claims are cognizable or that Teague does

15  not apply, Petitioner's claims fail on the merits.

16       With regard to an entrapment defense, due process may be violated when

17  the government's conduct is "so outrageous that due process principles would

18  absolutely bar the government from invoking judicial processes to obtain a

19  conviction." United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L.

20  Ed. 2d 366 (1973); United States v. King, 200 F.3d 1207, 1213 (9th Cir. 1999).

21  The standard for establishing outrageous conduct is extremely high. United States

22  v. McClelland, 72 F.3d 717, 721 (9th Cir. 1995). Such outrageous conduct occurs

23  only when the government "completely fabricat[es] the crime solely to secure the

24  defendant's conviction, or [ ] us[es] excessive physical or mental coercion." Id.

25  (internal quotations omitted); Emmert, 829 F.2d at 811. In this case, there is no

26  evidence the police engaged in outrageous conduct.

27       Moreover, Petitioner did not establish the entrapment defense as a matter of

28  California or federal law. Under California law, the test for determining

16

entrapment is whether the acts of the law enforcement agent are "likely to induce a normally law-abiding person to commit the offense." People v. Barraza, 23 Cal. 3d 675, 689-90 (1979). Although the test focuses primarily on the conduct of the law enforcement agent, it also requires consideration of the effect that the conduct would have on a normally law-abiding person under the circumstances presented. Id. at 690. The test is objective rather than subjective and thus the suspect's character, predisposition to commit the offense, and subjective intent in committing the crime are irrelevant. Id. at 690-91.

Here, the police conduct was not extraordinary. The police merely provided Petitioner with the opportunity to commit the crimes charged. There is no indication that the police conduct was physically or psychologically coercive. Moreover, the testimony established that Petitioner approached the officers' car and asked if they wanted to buy "a dub" as soon as they said hello to him. (RT at 637-38, 648-49, 664-65, 676-77.)   Then, Petitioner handed Officer Munoz a piece of rock cocaine in exchange for a $20 bill. (Id. at 638-39.)   After the exchange, Petitioner asked for a "hit," and, after initially refusing, the officers told Petitioner he could break off a piece of the rock. (Id. at 677-78.)   The jury saw a videotape of the transaction. (Id. at 646-47.)   Petitioner did not testify and did not present an affirmative defense.[7]   Neither Petitioner or co-defendant, nor the prosecution,

---

[7] On cross-examination, after reading from the transcript of the video recording the colloquy between himself and the officers in which Petitioner asked for a hit of the cocaine he had just sold the officers, Petitioner then asked Officer Villaneuva why he "continue[d] to insist that I [Petitioner] give you that other rock." (RT at 676-78.)   It is clear from the transcript that it was Petitioner who was insisting he wanted a hit and that the officers initially refused but then told him he could break off a piece. (Id.)   He also established that after he handed the rock to Officer Munoz, she handed it back to him so that he could break off a piece. (Id.)   There is nothing in this testimony to show Petitioner was induced to

(continued...)

17

1  presented any evidence establishing entrapment.  Thus, Petitioner's claim of

2  entrapment as a matter of California law fails.

3         Under federal law, the entrapment defense has two elements:  government

4  inducement of the crime and absence of predisposition on the part of the

5  defendant.  <u>United States v. Sandoval-Mendoza</u>, 472 F.3d 645, 648 (9th Cir. 2006)

6  (quoting <u>United States v. Skarie</u>, 971 F.2d 317, 320 (9th Cir. 1992)).  "Inducement

7  is any government conduct creating a substantial risk that an otherwise

8  law-abiding citizen would commit an offense." <u>Id.</u> (internal quotation marks

9  omitted) (citation omitted).  Where the government has induced a defendant to

10 break the law, the prosecution must prove beyond a reasonable doubt that the

11 defendant was predisposed to commit the criminal act.  <u>See</u> <u>Jacobson v. United</u>

12 <u>States</u>, 503 U.S. 540, 548-49, 112 S. Ct. 1535, 118 L. Ed. 2d 174 (1992).  When

13 assessing entrapment, the Court considers five factors:  (1) the character of the

14 defendant, (2) who first suggested the criminal activity, (3) whether the defendant

15 engaged in the activity for profit, (4) whether the defendant demonstrated

16 reluctance, and (5) the nature of the government's inducement.  <u>United States v.</u>

17 <u>Citro</u>, 842 F.2d 1149, 1152 (9th Cir. 1988).  The extent of the defendant's

18 reluctance is the most important factor.  <u>Id.</u>

19        In this case, Petitioner has failed to demonstrate that he was in any way

20 "induced" to commit the criminal act.  Although they provided Petitioner with the

21 opportunity to break the law, the police did not coerce or pressure Petitioner to sell

22 them rock cocaine.  Nor did Petitioner show any reluctance to sell the officers the

23 rock cocaine.  As there was no evidence presented to demonstrate that the officers

24 induced Petitioner to commit the crime, Petitioner's entrapment defense was

25 properly rejected.

26

27 _____

   [7](...continued)
28 sell cocaine to the officers.

1    Moreover, the trial court did not preclude Petitioner from presenting

2 evidence of entrapment.  In fact, when Petitioner told the court he wanted to

3 present that defense, the court said "That's fine," but also informed Petitioner that

4 "by entering the entrapment defense . . . you are admitting that you did [it]." (RT

5 at E10-12.)  The court also defined entrapment for the jury panel during voir dire

6 after Petitioner began discussing the concept.  (1st Aug. RT at 56-59.)  During

7 opening statements, Petitioner told the jury he was going to present a defense of

8 entrapment based on the actions of the officers.  (RT at 631-32.)  Specifically, he

9 stated, without objection, that the police officers paid him in order to get him "to

10 do something." (Id. at 632.)  Thus, there is no evidence the court precluded

11 Petitioner from presenting such a defense – it is just that during trial, Petitioner did

12 not present one.

13    With regard to the trial court's refusal to provide a jury instruction on

14 entrapment, in order to warrant federal habeas relief, the omission of a jury

15 instruction must violate some due process right guaranteed by the Fourteenth

16 Amendment.  Cupp v. Naughten, 414 U.S. 141, 146, 94 S. Ct. 396, 38 L. Ed. 2d

17 368 (1973) (standard for issuance of challenged instruction); Murtishaw v.

18 Woodford, 255 F.3d 926, 971 (9th Cir. 2001) (Cupp standard applies to omitted

19 instructions).  In challenging the failure to give an instruction, a habeas petitioner

20 faces an "especially heavy" burden.  Henderson v. Kibbe, 431 U.S. 145, 155, 97 S.

21 Ct. 1730, 52 L. Ed. 2d 203 (1977); Villafuerte v. Stewart, 111 F.3d 616, 624 (9th

22 Cir. 1997).  However, the Ninth Circuit has held that the failure to instruct on a

23 theory of defense may constitute a violation of due process by depriving the

24 defendant of the right to present his case where the defendant has presented

25 substantial evidence to support that defense.  Bradley v. Duncan, 315 F.3d 1091,

26 1098-1100 (9th Cir. 2002); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000).

27    In this case, however, because there was no entrapment evidence presented

28 to the jury, there was nothing to warrant a jury instruction on that defense, or any

19

reason to allow Petitioner to argue entrapment to the jury. (<u>See, e.g.</u>, <u>id.</u> at 905-07, 945-49.)  Accordingly, the trial court did not violate Petitioner's rights to due process and a fair trial by refusing to instruct the jury regarding the entrapment defense, or by prohibiting Petitioner from discussing entrapment in his closing argument.

In sum, Petitioner's entrapment claims are not cognizable on federal habeas review.  Moreover, the police conduct was not outrageous and did not violate due process.  Finally, even if Petitioner's claims were cognizable, no evidence of entrapment was presented to the jury and, therefore, he did not establish the entrapment defense as a matter of California or federal law.  Accordingly, habeas relief is not warranted on Claims One and Two.

**B.**   **Habeas Relief Is Not Warranted on Petitioner's Claim That He Was Denied His Right to Confront and Cross-Examine Witnesses.**

**1.**   **Background.**

Petitioner contends that his rights to confront witnesses, to a fair trial, and to present a defense were violated because the prosecutor rested without calling Officer Munoz or Sergeant Congolton to testify, thereby preventing Petitioner from cross-examining them.  (Pet. Attach. at 15-17a.)

Specifically, Officer Munoz was one of the undercover officers involved in the drug transaction.  She did not testify at the preliminary hearing but was on the People's witness list and appeared in court the day set for trial.  (Pet. Ex. C; RT at 302.)  The prosecutor did not call her to testify, nor did Petitioner or counsel for co-defendant Richards.  Sergeant Congolton was one of the officers who briefly detained Petitioner and Richards after the drug transaction.  (CT at 23, 26; 2d Aug. CT at 4.)  He also did not testify at the preliminary hearing.  Although he was on the People's witness list (Pet. Ex. C), he was not called as a witness at trial by the prosecution, Petitioner, or counsel for co-defendant Richards.

1    **2.    California Court Opinions.**

2    The California Court of Appeal rejected this claim:

3        Taylor argues that his confrontation and due process rights were

4    violated because the prosecutor did not call Munoz or Sergeant

5    Congolton to testify.  Taylor should have called these witnesses if he

6    wanted their testimony; the prosecutor's decision not to call them did

7    not violate Taylor's rights.

8    (Lodgment 17 at 10.)

9    **3.    Analysis.**

10    "Whether rooted directly in the Due Process Clause of the Fourteenth

11   Amendment . . . or in the Compulsory Process or Confrontation clauses of the

12   Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a

13   meaningful opportunity to present a complete defense.'"  Crane v. Kentucky, 476

14   U.S. 683, 690 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986); Moses v. Payne, 555 F.3d

15   742, 757 (9th Cir. 2009).  The Supreme Court has explained the importance of

16   these rights:

17        The right to offer the testimony of witnesses, and to compel their

18        attendance, if necessary, is in plain terms the right to present a defense,

19        the right to present the defendant's version of the facts as well as the

20        prosecution's to the jury so it may decide where the truth lies.  Just as an

21        accused has the right to confront the prosecution's witnesses for the

22        purpose of challenging their testimony, he has the right to present his

23        own witnesses to establish a defense.  This right is a fundamental

24        element of due process of law.

25   Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)).

26   The prosecution's failure to call a particular witness does not violate a petitioner's

27   right of confrontation.  Cooper v. California, 386 U.S. 58, 62 n.2, 87 S. Ct. 788, 17

28   L. Ed. 2d 730 (1967) (rejecting as "absolutely devoid of merit," petitioner's

contention that the prosecution's failure to produce a particular witness violated the petitioner's right of confrontation).

Petitioner has presented no evidence, and the Court finds no evidence in the record, that these witnesses were unavailable or that Petitioner was in any way prevented from calling these witnesses at trial.  In fact, after co-defendant Richards testified on his own behalf, Petitioner rested without calling any witnesses.  (RT at 754-55.)

Based on the foregoing, the Court finds that the California court's rejection of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.  Thus, habeas relief is not warranted on this claim.

**C.**   **Habeas Relief Is Not Warranted on Petitioner's Claim Regarding the Alleged Destruction of Evidence.**

  **1.**   **Background.**

Petitioner contends that the failure to preserve the remaining rock cocaine, to admit the chemical analysis or toxicology reports into evidence at the preliminary hearing, and to call Tom McCleary, a forensic chemist, to testify at the preliminary hearing, violated his rights to due process and a fair trial.  (Pet. Attach. at 17b-19.)

  **2.**   **California Court Opinions.**

The California Court of Appeal denied Petitioner's claim:

Taylor also makes numerous claims regarding the testing and analysis of the cocaine rock he sold to the officers.  First, he argues that the prosecutor failed to introduce evidence at the preliminary hearing and at trial that the rock contained cocaine base, resulting in insufficient evidence in both proceedings.  Taylor is wrong.  At the preliminary hearing, the attorneys representing Taylor and Richards stipulated that Tom McCleary would be "deemed to have been duly called, sworn,

testified as an expert forensic chemist, and that Tom McCleary did a chemical and physical analysis of the item booked under file No. 0897156, with a lab receipt number of K007651, under the subject name of Taylor, first name is Larry, and came to the expert conclusion and opinion that that item had a net weight of approximately .12 grams of solid substance containing cocaine in the base form." At trial, McCleary testified that he tested the item booked by the Pomona Police Department under file number 0897156, with a lab receipt number of K007651 and suspect name of Larry Taylor and found it to contain "approximately 0.12 grams of a solid substance containing cocaine in the base form." Taylor also argues that prior to trial the prosecutor "served" him with a "laboratory report" that was similar to the stipulation at the preliminary hearing, but the prosecutor did not introduce the "laboratory report" at trial. This seems to be a misunderstanding of terms. The minute order and the portion of the reporter's transcript cited by Taylor in support of his claim that he was "served" with a "laboratory report" use the phrase "lab receipt." During cross-examination at trial by Taylor, McCleary clarified that the "lab receipt" was his "chemical analysis report." A photocopy of the "lab receipt" was admitted as part of People's exhibit 1 at trial, and McCleary identified it as a copy of his "lab receipt."

Next, Taylor argues that "the criminalist and the prosecutor destroyed evidence by using all of the alleged rock in the testing process." Although Taylor repeatedly made this assertion in his motions and arguments to the trial court, nothing in the record supports his claim that the rock was destroyed. Indeed, McCleary testified at trial that after he conducted his testing, the rock was smaller because he "consumed some of the material during the testing." The loss of some mass is not

23

equivalent to complete destruction.   Taylor argues in his fifth supplemental brief that the prosecutor "explained" at the preliminary hearing that the cocaine rock "was used up in the testing process."  No such statement appears in the transcript of the preliminary hearing or anywhere else in the record, except in Taylor's motions.  Taylor also argues the prosecutor "showed bad faith by failing to request and submit the toxicology report to the defense and the court, or to to [sic] stipulate that the drug test report was inconclusive as to item No. 1 containing cocaine base."  The record does not support Taylor's assertions that testing was inconclusive or that a toxicology report existed.  To the extent that Taylor is referring to the printout of the infrared spectroscopy that McCleary testified was one of the tests he used in reaching his conclusion that the rock contained cocaine base, Taylor fails to show how he was prejudiced by the failure to receive the printout, but merely wondered if McCleary's testimony was reliable.  Taylor also complains of the reliability of a "NIK" field test apparently used by one of the police officers to test the rock before submitting it to McCleary for analysis.  This is irrelevant as the prosecution did not rely upon the results of a field test to establish the composition of the rock.  Taylor also argues that, in the absence of the "toxicology report," McCleary's testimony was an inadmissible opinion based upon a hypothetical state of facts not supported by the evidence.  McCleary testified to his actual scientific testing of the rock, not an opinion based upon a hypothetical.

(Lodgment 17 at 10-12.)

**3.   Analysis.**

**a.   Failure to Preserve.**

Petitioner contends that the failure to preserve the remaining rock cocaine after testing violated his rights to due process and a fair trial.

24

There is no indication in the record that the cocaine was destroyed.[8]  At trial, McCleary testified that he had received a .12 gram rock of cocaine from the police department and that it weighed .02 gram less than indicated in the police report probably due to the department's initial testing of the rock.  (RT at 689.)  He also testified that after his testing, it would have been smaller.  (Id.)  Even if the cocaine had lost some mass after testing, Petitioner does not state how this was prejudicial to his trial.  Thus, habeas relief is not warranted on this claim.

### b.     **Failure to Admit Testimony and Reports of Forensic Chemist at Preliminary Hearing.**

Petitioner contends that the failure to admit testimony and reports of the forensic chemist, McCleary, at the preliminary hearing, violated his rights to due process and a fair trial.  He contends that these failures "amounted to a destruction of evidence."  (Pet. Attach. at 19.)

Specifically, at the preliminary hearing, the prosecutor and defense counsel, including then-counsel for Petitioner,[9] entered into the following stipulation:

> [Prosecutor]:  Counsel, may it be stipulated that Tom McCleary be deemed to have been duly called, sworn, testified as an expert forensic chemist, and that Tom McCleary did a chemical and physical analysis of the item booked under file No. 0897156, with a lab receipt number of K007651, under the subject name of Taylor, first name is

---

[8]  The Court notes that Exhibit 1 at trial contained a photograph of the rock cocaine handed to Officer Munoz by Petitioner.  (Pet. Attach. at 21; see also, e.g., RT at 638.)  Exhibit 2 was a photograph of the rock cocaine handed to Officer Villaneuva by co-defendant Richards.  (RT at 641.)  The Court can find nothing in the record to indicate whether any cocaine remaining after testing was still in the possession of the police department.

[9]  As noted by the court of appeal, Petitioner represented himself at trial. (Lodgment 17 at 5.)

1    Larry, and came to the expert conclusion and opinion that that item had

2    a net weight of approximately .12 grams of solid substance containing

3    cocaine in the base form?

4         [Counsel for Petitioner]: For the purpose of preliminary hearing,

5    so stipulated.

6         . . . .

7         [Counsel for Richards]: For prelim only, so stipulated.

8    (CT at 30.)

9    Again, Petitioner fails to show how he was prejudiced by this stipulation in

10   lieu of having McCleary testify to the same thing in person at the preliminary

11   hearing.[10]

12   Petitioner appears to be contending that because McCleary did not submit

13   his spectrum printout or handwritten notes at the preliminary hearing or the trial,

14   the prosecutor had misled the court and the defense about providing Petitioner

15   with these two documents:

16        McCleary then testified that he did not submit his spectrum

17   printout, (toxicology report), or his handwritten notes at the preliminary

18   hearing because they were not requested. . . . The prosecutor had misled

19   the courts and the defense about serving petitioner these two documents

20   of evidence.  However, the criminalist, McCleary did not submit any

21   chemical analysis report, spectrum printout, or bench notes into

22   ────────────────

23   [10]   A review of the record shows that Petitioner may have misunderstood the
24   nature of a stipulation: "[Petitioner]: . . . They stipulated . . . that Tom McCleary
     was supposedly came to court and testified that he conducted a chemical analysis
25   test on the cocaine, but he never came to court and testified to anything." (Supp'l
26   RT at A3, E4-E7.)  The result of the stipulation, entered into by Petitioner's
     counsel at the preliminary hearing, was an agreement that McCleary would *not*
27   have to appear and testify at the preliminary hearing, and a statement as to his
28   findings for purposes of the preliminary hearing.  (CT at 30.)

1     evidence during trial.

2 (Pet. Attach. at 23 (citation omitted).)  Petitioner confuses document discovery

3 (i.e., serving Petitioner with the report and notes), with admission of evidence at

4 the preliminary hearing or trial.  A review of the record shows numerous hearings

5 on Petitioner's complaints regarding discovery problems, most of which reflect his

6 lack of knowledge or understanding of the legal process.  (See, e.g., RT at A3-A4,

7 C6, C14-15 (arguing that he did not want to accept discovery from the prosecution

8 because he wanted the judge to rule on his motion to exclude evidence before he

9 accepted the package); C17-18, E4-E7, E10-E12, 43-49 (discussing Petitioner's

10 refusal to accept materials from his own investigator), 1st Aug. RT at 10-13, 2d

11 Aug. RT at 8-12 (discussing Petitioner's refusal to accept discovery from the

12 prosecution or his investigator because he believed a deadline for production had

13 passed).)

14     The record also clearly reflects that prior to trial Petitioner received copies

15 of the lab receipt and the handwritten notes of the criminalist.[11]  (CT at C17-C18.)

16 He fails to demonstrate how he was prejudiced from the alleged failure to provide

17 him with the spectrum report about which the criminalist testified and on which he

18 was cross-examined by Petitioner.  In fact, on cross-examination, McCleary

19 testified that he prepared a chemical analysis report which he submitted but that he

20 would not normally submit the spectrum printout or handmade notes on which his

21 report was based, unless specifically requested.  (RT at 690-91.)

22     As noted by Respondent, stipulations regarding expert testimony are

23 common.  (Answer at 22 (citing Brown v. Illinois, 422 U.S. 590, 594 n.3, 95 S. Ct.

24 2254, 45 L. Ed. 2d 416 (1975) (noting trial stipulation regarding testimony of

25

26 _____

27    [11]  Less clear is whether Petitioner ever received a copy of the spectrum

28 printout.  The California Court of Appeal seems to accept that Petitioner was not
provided that printout.  (See, e.g., CT at E6-E7; Lodgment 17 at 12.)

1  ballistics expert); <u>United States v. Tavakkoly</u>, 238 F.3d 1062, 1067 (9th Cir. 2001)

2  (parties stipulated that chemist determined opium weighted 1,350.6 grams).)  Such

3  stipulations have never been found to constitute a suppression of evidence or

4  otherwise violate a defendant's constitutional rights, and the stipulation at the

5  preliminary hearing did not do so here.

6        Based on the foregoing, the Court finds that the California court's rejection

7  of Petitioner's claim was neither contrary to, nor involved an unreasonable

8  application of, clearly established federal law, as determined by the United States

9  Supreme Court.  Thus, habeas relief is not warranted on this claim.

10  **D.    Habeas Relief Is Not Warranted on Petitioner's Claim That Insufficient**

11       **Evidence Supported His Conviction.**

12       **1.    Background.**

13        Petitioner contends that insufficient evidence supports his conviction

14  because the prosecutor failed to prove that the drug sold to the officers contained

15  cocaine base.  (Pet. Attach. at 20-25.)  Specifically, he claims that the prosecutor

16  failed to admit the chemical analysis report into evidence, that the "NIK" field test

17  conducted by the police is unreliable, and that McCleary's expert opinion was

18  unreliable because the spectrum printout was not admitted into evidence to support

19  that opinion.  (<u>Id.</u>)

20       **2.    California Court Opinions.**

21  The California Court of Appeal rejected Petitioner's claims:

22        Taylor also argues that prior to trial the prosecutor "served" him

23   with a "laboratory report" that was similar to the stipulation at the

24   preliminary hearing, but the prosecutor did not introduce the "laboratory

25   report" at trial.  This seems to be a misunderstanding of terms.  The

26   minute order and the portion of the reporter's transcript cited by Taylor

27   in support of his claim that he was "served" with a "laboratory report"

28   use the phrase "lab receipt."  During cross-examination at trial by

28

Taylor, McCleary clarified that the "lab receipt" was his "chemical analysis report."[12]  A photocopy of the "lab receipt" was admitted as part of People's exhibit 1 at trial, and McCleary identified it as a copy of his "lab receipt."

. . . Taylor also complains of the reliability of a "NIK" field test apparently used by one of the police officers to test the rock before submitting it to McCleary for analysis.  This is irrelevant as the prosecution did not rely upon the results of a field test to establish the composition of the rock.  Taylor also argues that, in the absence of the "toxicology report," McCleary's testimony was an inadmissible opinion based upon a hypothetical state of facts not supported by the evidence.  McCleary testified to his actual scientific testing of the rock, not an opinion based upon a hypothetical.

(Lodgment 17 at 11-12.)

### 3.   **Legal Standard.**

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).  The Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction in Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Under Jackson, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

---

[12]  The Court does not agree that Petitioner was referring to Exhibit 1 during his examination of McCleary.  In fact, it appears that he may have simply been holding up a copy of the "chemical analysis report" itself.  (RT at 690.)

1   Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Supreme Court has

2   held that "the relevant question is whether, after viewing the evidence in the light

3   most favorable to the prosecution, *any* rational trier of fact could have found the

4   essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at

5   319; see also Wright v. West, 505 U.S. 277, 284, 112 S. Ct. 2482, 120 L. Ed. 2d

6   225 (1992).  "Put another way, the dispositive question under Jackson is 'whether

7   the record evidence could reasonably support a finding of guilt beyond a

8   reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982-83 (9th Cir. 2004) (en

9   banc) (quoting Jackson, 443 U.S. at 318).

10      The Jackson standard applies to federal habeas claims attacking the

11   sufficiency of the evidence to support a state conviction.  Juan H., 408 F.3d at

12   1274; Chein, 373 F.3d at 983; see also Bruce v. Terhune, 376 F.3d 950, 957 (9th

13   Cir. 2004).  The AEDPA, however, requires the federal court to "apply the

14   standards of Jackson with an additional layer of deference."  Juan H., 408 F.3d at

15   1274.  The federal court must ask "whether the decision of the California Court of

16   Appeal reflected an 'unreasonable application' of Jackson and Winship to the facts

17   of this case."  Id. at 1275 & n.13.

18      **4.   Analysis.**

19      The actual "contents" of trial Exhibit 1 are uncertain.  At a minimum, it

20   consists of a photograph of an envelope on the front of which is shown a "lab

21   receipt" and McCreary's handwritten initials and the date and a photograph of the

22   rock cocaine;[13] it also may *possibly* consist of the property receipt/form and

---

[13]  As previously noted (supra note 12), the Court is not convinced that the
"lab receipt" and the "chemical analysis report" are one and the same.  (See
Answer at 25.)  The lab receipt appears to be only a receipt with the number
K007651, the number given to the cocaine evidence by the lab.  (RT at 687.)  The
chemical analysis report would presumably actually consist of McCreary's

(continued...)

supplemental reports filled out by the task force regarding the results of the NIK test. (See, e.g., RT at Exhibits (noting "Evidence Envelope and its Contents"), 638-39, 687-91, 702, 705.) The criminalist, McCreary, testified that he performed a color screening test and a 48 transform infrared spectroscopy test on the cocaine and came to the conclusion that the item consisted of "approximately 0.12 grams of a solid substance containing cocaine in the base form." (Id. at 688.) On cross-examination, Petitioner presented McCreary with a "chemical analysis report," and asked McCreary whether it was the report that he prepared and submitted.[14] (Id. at 690.) McCreary answered that it was his report and confirmed that in addition to the report, he also had a spectrum printout of the test results and some "handmade" notes that he would not have submitted with the report unless specifically requested. (Id.) The NIK field test, which apparently tests for the presence of cocaine (id. at 700), was conducted by the police and was not something on which McCreary relied in arriving at his opinion. Nor is there any indication that the NIK test is in any way unreliable.[15]

The jury was instructed that it was not required to accept the opinions of the expert as true or correct, and that the meaning and importance of any opinion was for them to decide. (CT at 216.) They were informed that they should consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information relied on by the expert in reaching that opinion. (Id.) They were also informed that it was for them to

_____

[13](...continued)
findings – i.e., that the item tested had a net weight of approximately .12 grams of solid substance containing cocaine in the base form.

[14] This document was not admitted into evidence.

[15] Even if it was unreliable, the tests conducted by McCreary also tested for the presence of cocaine base and found it.

31

1 decide wether the information relied on by the expert was true and accurate.  (Id.)

2 The jury is presumed to have followed the court's instructions.  Weeks v.

3 Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000).  Petitioner

4 has provided no evidence to the contrary.

5      Moreover, no evidence was admitted to call into question McCleary's test

6 results.  McCleary testified as to his background and experience, and stated that he

7 personally tested the rock using two different tests, tests which he considered to be

8 "valid and unexceptional," and found the sample contained cocaine base.

9 Petitioner would have the Court weigh this evidence differently because the

10 expert's actual report was not admitted into evidence.  There is no reason to do so;

11 indeed, the Court must refrain from engaging in such a re-weighing of the

12 evidence.  Schlup v. Delo, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808

13 (1995) ("under Jackson, the assessment of the credibility of witnesses is generally

14 beyond the scope of review"); Bruce, 376 F.3d at 957 ("A jury's credibility

15 determinations are . . . entitled to near-total deference under Jackson."); Walters v.

16 Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (a federal habeas court "must respect

17 the province of the jury to determine the credibility of witnesses, resolve

18 evidentiary conflicts, and draw reasonable inferences from proven facts by

19 assuming that the jury resolved all conflicts in a manner that supports the

20 verdict").

21      After viewing the evidence presented at trial in the light most favorable to

22 the prosecution and presuming that the jury resolved all conflicting inferences

23 from the evidence against Petitioner, the Court finds that a rational juror "could

24 reasonably have found beyond a reasonable doubt" that Petitioner was guilty of

25 selling or giving away cocaine base.  Jackson, 443 U.S. at 325-26.  Mindful of the

26 "sharply limited nature of constitutional sufficiency review" and applying the

27 "additional layer of deference" required by the AEDPA, this Court is unable to

28 find that the California court's rejection of this claim was objectively

unreasonable.  <u>Juan H.</u>, 408 F.3d at 1274-75; <u>see also</u> <u>Jackson</u>, 443 U.S. at 319, 326.  Thus, habeas relief is not warranted on this claim.

**VII.**

**ORDER**

Based on the foregoing, IT THEREFORE IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: April 18, 2012          1

HONORABLE OSWALD PARADA
United States Magistrate Judge

33